381 P.2d 554

**Barbara ELFBRANDT, for herself and others similarly situated, Appellants,**

**v.**

**Imogene R. RUSSELL, L. E. Bool and Martha L. Elliott, members of the Board of Trustees of Amphitheater Elementary School District, No. 10, Pima County, State of Arizona, et al., Appellees.**

**No. 7406.**

Supreme Court of Arizona.

En Banc.

May 1, 1963.

Rehearing Denied May 28, 1963.

Morgan & Rosenberg, Tucson, for appellants.

Robert W. Pickrell, Atty. Gen., Philip M. Haggerty, Asst. Atty. Gen., and Harry Ackerman, Pima County Atty., for appellees.

STRUCKMEYER, Justice.

Appellant as a teacher in the Arizona Public School System at Tucson is required by A.R.S. § 38–231 and § 38–233 as amended by Chapter 108, Laws of 1961 to subscribe to the oath required of all public officers and employees [See Appendix]. This she has refused to do. She brings this action for herself and for others similarly situated seeking a declaration that the Arizona Officers and Employees Loyalty Oath deprives her of rights guaranteed under the state and federal constitutions. The cause was submitted to the lower court on stipulated facts and the appeal is from its judgment holding the challenged portions of the amended statutes constitutional.

From the time of this State's inclusion as a territory in 1863 every public officer as a condition of employment and before entering upon the duties of his office has been required to take and subscribe to an oath differing but slightly from that now specified in A.R.S. § 38–231. The territorial oath was in this language:

"I, ———, do solemnly swear that I will support the Constitution of the United States and the laws of this Territory; that I will true faith and allegiance bear to the same, and defend them against all enemies whatsoever, and that I will faithfully and impartially discharge the duties of the office of (name of office) according to the best of my abilities, so help me God." Chapter XXV Sec. 4, Howell's Arizona Code, 1864.

We pause here only to note that because the Arizona Declaration of Rights, Art. 2, § 7, Constitution of Arizona, A.R.S., permits public officers and employees to either swear or affirm in a manner most consistent with and binding upon the conscience of the person, the compulsive subscription does not impinge on religious or conscientious scruples.

As a generality, it can be said that qualifications for public officers and employees of the state may be fixed by the legislature where not otherwise prescribed

by the State Constitution. McCarthy v. State ex rel. Harless, 55 Ariz. 328, 101 P.2d 449; Campbell v. Hunt, 18 Ariz. 442, 162 P. 882. The power to prescribe qualifications of public officers and employees is essential to the independence of the states and to their peace and tranquility and should be free from external interference unless conflicting with the Constitution of the United States. Taylor v. Beckham, 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187. Where there are suitable reasons, positions of public importance may be denied to groups of persons identified by their particular interests. Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408. We do not doubt that the legislature in order to preserve the integrity of the public service and safeguard it from disloyalty may enact statutes designed to reasonably attain those ends. Loyalty may be a prescribed qualification for the holding of public employment. Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L. Ed. 517, 27 A.L.R.2d 472.

Under constitutional government oaths similar in context to that here have been considered as an appropriate means to bind the individual. As has often been pointed out the President of the United States is required to take this oath or affirmation:

"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States." Constitution of the United States, Art. 2, Sec. 1.

■ For centuries the oath was a pledge of fealty to the king. It does "not increase the civil obligation to loyalty; it only strengthens the *social* tie by uniting it with that of *religion.*" 1 Blackstone's Commentaries (16th Ed.) 369. It is considered as an expression of devotion to the government, an express engagement of that which every citizen owes to his country, Imbrie v. Marsh, 5 N.J.Super. 239, 68 A.2d 761; Affirmed 3 N.J. 578, 71 A.2d 352, 18 A.L.R.2d 241; for as stated by Justice Story in 1838:

"Oaths have a solemn obligation upon the minds of all reflecting men, and especially upon those who feel a deep sense of accountability to a Supreme Being." 2 Story, Commentaries on the Constitution of the United States (5th ed.) 613, § 1844.

As such it is an appeal to God to witness the truth of what is declared and an imprecation of divine punishment if what is said is false. See 18 A.L.R.2d 268.

We find nothing within the express language of the oath to which all may not conscientiously and with devotion to the government subscribe.

There is, however, incorporated within the oath a promise that the public officer or employee is not presently engaged in and

in the future will refrain from certain conduct.

> "Any officer or employee * * * having taken the * * * oath or affirmation * * * knowingly or wilfully at the time of subscribing * * or * * * thereafter during his term of office * * * does commit or aid in the commission of any act to overthrow by force or violence the government of this state or * * * advocates the overthrow by force or violence * * * or * * * becomes * * * a member of the communist party * * * or its successors or any of its subordinate organizations * * having for one of its purposes the overthrow by force or violence of the government of the state of Arizona * * * shall be guilty of a felony and upon conviction * * * subject to all the penalties for perjury; * * *." § 38–231, subd. E.

The legislature has recognized that it is not to everyone the taking of an oath bears a deep sense of accountability to a supreme being and therefore has provided more worldly penalties to compel adherence. It has in effect said that the doing of the proscribed acts constitutes a failure to support the constitution and the laws of the state and to defend them against their enemies. When confronted with the problem of the state's interest in security, sanctions may be supplied to coerce and deter its enemies from seeking or holding public employment. Garner v. Board of Public Works of Los Angeles, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317. The state may demand an oath of a person seeking public office that he is not engaged in the commission of any act to overthrow by force or violence the government of the state or any of its political subdivisions. Gerende v. Board of Supervisors of Elections of Baltimore, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745.

What we have said here would ordinarily dispose of this action for we do not entertain attacks on the constitutionality of a statute by those whose rights have not in some way been actually or injuriously affected or directly involved, Gherna v. State, 16 Ariz. 344, 146 P. 494, Anno. Cas.1916D 94. But in this instance we recognize the problem to appellant is one of potential deterrence of constitutionally protected conduct. The compulsion of the oath weighs most heavily on those whose scruples are the most sensitive. See Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285. Accordingly, we reach the constitutional questions raised, but neither expressly nor by implication do we pass judgment upon Section 4 of Chapter 108 considering that the mere existence of a criminal statute is not such a threat as to present a justiciable con-

troversy. cf. Hitchcock v. Kloman, 196 Md. 351, 76 A.2d 582.

 The attacks directed against this oath question nearly every conceivable constitutional aspect. Not all merit serious consideration. For example, there is here no indiscriminate classification of innocence with knowing activity as was found offensive in Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216. Consistent with our interpretation, in part stated hereafter, it does not have the unconstitutional vice of vagueness and indefiniteness in placing an accused on trial for an offense, the nature of which he is given no fair warning, for punishment is restricted to specified acts knowingly and wilfully committed. cf. American Communications Ass'n v. Douds, 339 U.S. 382, 413, 70 S.Ct. 674, 94 L.Ed. 925.

 It does not violate any rights protected by the Fifth and Sixth Amendments to the Constitution of the United States for neither are there penalties imposed for past activities nor is appellant required to divulge her past activities or associations. Ullman v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511, 53 A.L.R.2d 1008. The Act is not a Bill of Attainder imposing punishment without conviction in the course of judicial proceedings. Here a person who has in the past engaged in the prohibited conduct can escape punishment by altering the course of his present activities. cf. Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625.

 Since the oath to which appellant has refused to subscribe has had reproduced upon it all of § 38–231, she has been clearly warned of the consequences of her refusal. There is not here a want of substantive due process. cf. In re Anastaplo, 366 U.S. 82, 81 S.Ct. 978, 6 L.Ed.2d 135. While § 38–233, requires that the oath be filed of record, it does not contemplate that the filing be rejected by the public officer in charge of the board or agency with which the filing is required. There is, hence, no denial of procedural due process. cf. Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460.

We assume that the legislature was not unaware of the decisions of the Supreme Court of the United States and therefore used the word "advocate" as meaning concrete action for forceful overthrow of the government rather than principles divorced from action. Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782; Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356; Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137.

The most troublesome question to be settled is the collision arising between individual liberties protected by the First

Amendment to the Constitution of the United States and the use of the police power of the state seeking to protect its citizens from potential calamity. On this issue some general observations point up the conclusions reached.

The police power of the state is the power vested in its legislature to make, ordain and establish all manner of wholesome and reasonable laws, statutes, and ordinances either with penalties or without as shall be judged to be good and for the welfare of the state and its residents. Sweet v. Rechel, 159 U.S. 380, 16 S.Ct. 43, 40 L.Ed. 188. It is the authority which resides in every sovereignty to pass all laws for the internal regulation and government of the state. Mutual Loan Co. v. Martell, 222 U.S. 225, 32 S.Ct. 74, 56 L.Ed. 175, Ann.Cas.1913B 529. While the police power is the·most essential and insistent power of government, rights secured or protected by the United States Constitution can not, of course, be overthrown or impaired by its exercise, Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679. Still,

> " * * * Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the Bill of Rights." Justice Holmes in Noble State Bank v. Haskell, 219 U.S.

104, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.1912A 487.

The command of the First Amendment requires that speech be fought with speech and falsehoods and fallacies be exposed, not suppressed, unless there is insufficient time to avert the evil consequences of noxious doctrines by argument and education. American Communications Ass'n v. Douds, supra. It is too well settled for argument that the right or privilege of free speech has its limitations. Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, 73 A.L.R. 1484. As has been pointedly observed, constitutionally protected freedom of speech is narrower than an unlimited license to talk.

In Dennis v. United States, supra, the test for determining acceptable limitations on free speech was stated as being that the decision must be based upon "whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." A somewhat different approach was used in the later case of Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105:

> "On the one hand, certain forms of speech, or speech in certain contexts, has been considered outside the scope of constitutional protection. See, e. g., Schenck v. United States, 249 U.S. 47,

39 S.Ct. 247, 63 L.Ed. 470; Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031; Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Beauharnais v. People of State of Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919; Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356; Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. On the other hand, general regulatory statutes, not intended to control the content of speech but incidently limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved. * * *"

We recognize the prohibited conduct in denying membership in the enumerated organizations diminishes the individual's freedom of association and hence the unfettered communication of ideas, but whatever test be applied, constitutional restraints are satisfied. The conduct sacrificed to governmental interests only minimally and incidentally conflicts with the First Amendment. The gravity of the evil sought to be reached, discounted by its improbability, justifies the invasion.

In considering the amended statutes we are conscious of the principle that courts are not concerned with the wisdom of legislation. Bohannan v. Corporation Commission, 82 Ariz. 299, 313 P.2d 379. Nor is it within our province to decide the propriety or expediency of the law. These are matters for the legislature's determination. We look to discover whether there is a basis for the enactments, Schrey v. Allison Steel Mfg. Co., 75 Ariz. 282, 255 P.2d 604 consistent with the scope of the First Amendment.

The State, an integral part of the nation, has enemies capable of nearly instantaneous devastation, the sworn foe of republican government and all democratic processes who have publicly vowed to "bury" us. Only the want of an opportune time defers the moment of the thermonuclear first strike. Self-preservation makes it the concern of all and the particular duty of public employees to be alert against internal weakening of the state government. It is to be observed that public officials and employees as the normal leaders in community affairs are sensitive to and the target of proselytization. Their possible failure in the performance of duties can but be attendant with the gravest consequences. The state's interest demands that public employees refrain from associations out of which even unconscious corruption may comfort those who seek world domination. Even memberships in the forbidden organizations

lend the influence of the members' names and offices to all aims and purposes. We need go no further; the evil sought to be restrained is evident.

The language of § 38–231, subd. E as amended has no relationship to beliefs. It prohibits any membership in any organization having for *one* of its purposes the overthrow by force and violence of the government of the State of Arizona or any of its political subdivisions including passive and nominal memberships. cf. Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782. It makes criminal after the taking and subscription to the oath all memberships in all organizations engaging in illegal advocacy. There is no imputation that public officers and employees may hold or retain memberships for exclusively lawful purposes. The risk that the insidious poison may be here spread is not one the people of the state are willing to accept.

 In arriving at our conclusions we have considered that the legislature has created a new crime, a felony, where none before existed, one which severely penalizes the formal act of association with certain groups. The critical act forbidden is the knowing or wilfull joining or remaining a member of an organization with knowledge of the illegal purpose. The memberships contemplated by the statute obviously must be determined not by conduct from which an inference may be drawn but by objective acts of joining and acceptance as members. cf. Killian v. United States, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256. No other interpretation is consistent with the spirit of the act.

 The legislature has declared by § 38–231, subd. D that an officer or employee shall not be entitled to compensation unless and until such officer or employee does take and subscribe to the form of oath. We construe the legislative intent as purely regulatory, meaning that when a proper affidavit is filed compensation shall be paid in full for past services.

The judgment of the court below is affirmed.

UDALL, V. C. J., and LOCKWOOD, J., concur.

BERNSTEIN, Chief Justice (specially concurring).

I agree with the following propositions developed in the majority opinion: 1. Loyalty to the state may be a prescribed qualification for the holding of a public office or of public employment. 2. The legislature may provide criminal sanctions to prohibit and deter enemies of the state from seeking or holding public employment. 3. The legislature has the power to proscribe subversive speech or conduct as well as the knowing or wilful joining or remain-

ing a member of an organization which has for one of its purposes the overthrow of the government by force or violence with knowledge of such illegal purpose. 4. The restriction of the first amendment freedoms of speech and association resulting from such legislation is justified by the clear and present danger which subversion poses to the survival of our free way of life. Furthermore, I agree that, subject to the limitations which I will point out, a loyalty oath may be made a part of the legislative scheme to determine and insure the loyalty of state officers and employees. Thus, my concern is not with *whether* the state can act to suppress disloyal conduct and speech, and to eliminate disloyal employees, but with *how* it may act to accomplish these ends.

It is axiomatic that in all of its legislative endeavors, a state must act with due process of law. I do not believe the plaintiff's contention that procedural due process is denied her can be fairly dismissed, as in the majority opinion, with the statement that there is no denial of procedural due process, since the statute does not permit the official with whom the oath is filed to reject it. Speiser

v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), cited by the majority, does not purport to define the outer limits of procedural due process.

One of the contentions of the plaintiff is that this legislation is unconstitutional because it fails to provide a hearing at which her refusal to take the oath may be explained. The majority opinion leaves the arguments of the plaintiff unanswered.[1] In my view, this contention raises the most serious issue in this appeal.

The plaintiff has a constitutional right not to be excluded from public employment for an arbitrary or discriminatory reason, Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952) or an unconstitutional reason, Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1962). A legitimate reason for her exclusion from public employment,[2] and the reason which provides the police power justification for this legislation, is the elimination of disloyal persons from critical and sensitive positions in our public schools, Adler v. Board of Public Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517

---

1. The U.S. Supreme Court has never ruled on this issue but has indicated its concern with it, Nostrand v. Little, 362 U.S. 474, 80 S.Ct. 840, 4 L.Ed.2d 892 (1960); Nostrand v. Little, 368 U.S. 436, 82 S.Ct. 464, 7 L.Ed.2d 426 (1962). See also Nostrand v. Little, 58 Wash.2d 111, 361 P.2d 551 (1961).

2. The legislature has chosen a curious method of enforcement of the oath requirement which permits those who refuse to take the oath to continue in their positions without pay. Dedicated subversives who may be supported by their organizations can continue their nefarious work in sensitive positions of public employment. For those unsubsidized persons who object to the oath for reasons of conscience, termination of pay is tantamount to discharge from employment, and must be so considered.

(1952). If however, her exclusion is based not upon a showing of disloyalty, but upon grounds of religion or conscience, she is excluded for arbitrary and discriminatory reasons—reasons which are not justified bases for the exercise of the police power. Thus, the critical question seems to me to be: Can the state, in pursuing the legitimate goal of eliminating disloyal persons from public employment, choose a method which in practical effect also eliminates those who are not shown to be disloyal?

The plaintiff, in a memorandum submitted in the lower court, has stated that her reason for refusing to take the oath is that she feels it conflicts with the moral philosophy taught by her religion. She states she cannot make either an oath or affirmation without violating her religious conscience.

Certainly the plaintiff may not claim exemption from every form of oath on grounds of conscience. The requirement of some oaths is written into the Constitution itself, and so established, transcends all questions of due process, U.S.Const. Art. VI, § 3. Cf. Arizona Const. Art. VI, § 26.

"Clearly the Constitution permits the requirement of oaths by officeholders to uphold the constitution itself. The obvious implication is that those unwilling to take such an oath are to be barred from public office. For the President, a specific oath was set forth in the Constitution itself. Art. II, § 1. And Congress has detailed an oath for other federal officers. Obviously the Framers of the Constitution thought that the exaction of an affirmation of minimal loyalty to the Government was worth the price of whatever deprivation of individual freedom of conscience was involved. * * *" American Communications Ass'n v. Douds, 339 U.S. 382, 415, 70 S.Ct. 674, 94 L.Ed. 925 (1950)

If there was involved here only the express oath of A.R.S. § 38–231, subd. G, an oath which the plaintiff appears to have subscribed without complaint prior to the 1961 embellishments, I would say it was merely an affirmation of minimal loyalty which may be required under constitutional precedent. But the 1961 oath has much greater significance than its predecessor, although the express wording is virtually unchanged. It is now inextricably interwoven with the criminal provisions of A.R.S. § 38–231, subd. E. If the oath taker is already engaged in the activities proscribed by subsection E, taking the oath is the act that makes her a criminal. If she engages in these activities after she takes the oath she is guilty of this crime because she has taken the oath. Moreover, the act requires that the criminal provisions be conjoined with the oath form that must be signed. The majority opinion realistically characterizes the relationship between certain provisions

14

of the oath and the criminal subsection as a "promise that the public officer or employee is not presently engaged in and in the future will refrain from certain conduct."

This is not to suggest that the state cannot create the crime defined in A.R.S. § 38-231, subd. E, or that it cannot make this crime applicable only to state officers and employees. As they have been interpreted in the majority opinion, the criminal provisions of the act may be a valid exercise of the police power. Furthermore, if the criminal provisions were completely divorced from the oath provisions, as would be the case if, for example, the criterion of the class to which they applied was defined to be "all state officers and employees," the oath would remain a simple affirmation of minimal loyalty. My point is this: In making the oath the element without which there can be no criminal offense, and in requiring that each officer and employee perform this element of the offense as a condition of public employment, the legislature has removed the oath from that class of affirmations of minimal loyalty which may be required without regard to discriminatory effect.[3] Now the standards of due process must be satisfied.

Most Americans take a loyalty oath with a feeling of patriotic pride and satisfaction. Nevertheless, there are those whose loyalty is unquestioned who, in sincere conscientious conviction refuse to subscribe to such oaths. For some, the objection is grounded in religious beliefs,[4] for others upon the con-

3. That even the simplest of oaths of loyalty may operate in a discriminatory manner cannot be denied. The man whose religious beliefs preclude him from taking any oath or affirmation of loyalty to a sovereign other than God, or who takes literally the scriptural admonition: "Swear not at all, neither by heaven; for it is God's throne, Nor by the earth; for it is his footstool: * * * But let your communication be, Yea, yea, Nay, nay; for whatsoever is more than these cometh of evil." (Matt. 5:34-35, 37.) though he be preeminently qualified in all other respects, cannot qualify to be President of this nation, U.S.Const. Art. II, § 1, nor judge of this court, Ariz. Const. Art. VI, § 26, nor serve in other federal or state offices, U.S.Const. Art. VI, § 3. He is excluded because of his religious beliefs, a type of discrimination which would be condemned by due process principles if the requirement of these simple oaths was not written into the

Constitutions under which our nation and state were organized.
4. See, e. g. the following statements of two public employees who refused to take a Pennsylvania loyalty oath similar in tenor to that now before us:
"I am by conviction, a Christian pacifist and am therefore opposed to the use of violent means for the achievement of any end, no matter how righteous. Certainly not for the overthrow of our Government which I love and cherish. I could therefore with perfect truthfulness take this oath. My objection to the Oath is that I feel its effect will be to curb freedom of thought and expression: a curb which we expect in communist countries but which is directly contrary to the spirit and practice of Democracy. During the long legislative struggle over this Bill, many teachers have been afraid to voice their opposition to it for fear of being suspected of subversion. This forcibly

cepts of academic or intellectual freedom.[5] There are undoubtedly other reasons for refusal to take the oath. However much we may disagree with the logic or reasonableness of these objections, we must admit that they do not prove disloyalty.

If, under this legislation there were no opportunity for those coming within its provisions to explain their refusal to take the oath, it would operate with equal vigor to eliminate the disloyal and the conscientious. But there has been no suggestion that the national security is in clear and present danger from those of unbending religious conscience or from champions of academic freedom. We must remember that the sole police power justification for this legislation is to eliminate disloyal persons from public office and employment.

Viewed in another way, an oath requirement without provision for a hearing would create an irrebutable presumption that one who refuses to take the oath is disloyal. Refusal to take the oath would be a conclusive ground of disqualification from public employment, yet the only qualification which is established by the act is loyalty. A statute which operates to deny a fair opportunity to rebut the presumption raised by its provisions is offensive to due process, Man-

illustrates to me the fact that the Bill is producing, among many, a timid conformity instead of the free thinking and discussion on which the stability and progress of our nation rests * * * for these reasons I cannot conscientiously support this Act. * * *".

Similarly:

"That the actual words of the Pennsylvania Loyalty Oath are relatively innocuous is a tribute to the resistance of a free people and their representatives against coercive forces that would cast our very thoughts in a mold of conformity, mechanization and violence. In spirit, however, the Oath is one of several instruments by which we are being 'persuaded' that totalitarian regimentation must be met by totalitarian, 100 per cent 'Americanism'. In a day when the impulse to conform, to acquiesce, to go along, is the instrument used in subjecting men to dictatorial rule throughout the world, non-conformity—with a religious motivation—becomes a means of preserving the dignity of man. Although I am neither communist nor subversive, I must say 'No' to the spirit of the Oath. Through the years Quakers have con-tinuously declared loyalty of citizenship, but the superficial and unreal implication that we have only to close our minds to Communism in order to save America is false and dangerous." Byse, Report on Pennsylvania Loyalty Act, 101 U.Pa.L.Rev. 480, Note 5 (1953).

5. See Mr. Justice Douglas' dissenting opinion in Adler v. Board of Education, 342 U.S. 485, 508, 72 S.Ct. 380, 96 L.Ed. 517 (1952) which contains a forceful argument for academic freedom. And cf. the October 17, 1962 Associated Press report of President Kennedy's comments when he signed into law a bill removing the requirement of a disclaimer affidavit (loyalty oath) from the National Science Foundation and National Defense Education Acts. The President stated he was glad to sign the law, and noted that 32 colleges and universities had refused to participate in the programs because of the disclaimer provisions. He was quoted: "It is highly unlikely that the affidavit requirement kept any communist out of the programs. * * * It did, however, keep out those who considered the disclaimer a bridle upon freedom of thought." Arizona Republic Oct. 18, 1962.

ley v. State of Georgia, 279 U.S. 1, 49 S.Ct. 215, 73 L.Ed. 575 (1928) ; City of Seattle v. Ross, 54 Wash.2d 655, 344 P.2d 216 (1959) ; People v. Wells, 33 Cal.2d 330, 202 P.2d 53 (1949) ; See State v. Childress, 78 Ariz. 1, 274 P.2d 333, 46 A.L.R.2d 1169 (1954).

In Adler v. Board of Education, 342 U. S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952), a statute made membership in organizations listed as subversive prima facie evidence of disqualification for employment as a teacher. The Supreme Court said:

> "Membership in a listed organization found to be within the statute * * * is a legislative finding that the member by his membership supports the thing the organization stands for, namely, the overthrow of government by unlawful means. We cannot say that such a finding is contrary to fact or that 'generality of experience' points to a different conclusion. Disqualification follows therefore as a reasonable presumption from such membership and support. *Nor is there here a problem of procedural due process. The presumption is not conclusive but arises only in a hearing where the person against whom it may arise has full opportunity to rebut it.* * * * 'Thus the phrase "prima facie evidence of disqualification" as used in the statute, imports a hearing at which one who seeks appointment to or retention in a public

school position shall be afforded an opportunity to present substantial evidence contrary to the presumption * * *.'" 342 U.S. at 494, 495, 72 S.Ct. at 386. (Emphasis added.)

If *membership in a subversive organization* cannot create a conclusive presumption of disqualification for public employment, much less can refusal to sign this loyalty oath be made conclusive grounds for disqualification.

The refusal to speak cases are also instructive on this issue. In Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956), the Supreme Court was faced with a provision of the charter of the City of New York which made a public employee's invocation of the self-incrimination privilege in an investigation dealing with his official conduct grounds for termination of the employment. The court held the provision invalid because, "In practical effect the questions asked are taken as confessed and made the basis of the discharge," 350 U.S. at 558, 76 S.Ct. at 641. Thus, refusal to speak cannot be taken as presumptive evidence of guilt of the acts inquired into. In three cases in which the Supreme Court upheld discharge of public employees because of their refusal to answer questions concerning possible subversive associations, the court was careful to emphasize, in each case, that dismissal was based not upon an unpermitted inference of guilt arising from

the refusal to answer, but upon other grounds, Beilan v. Board of Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958) (dismissal upon statutory ground of incompetence as broadly interpreted by state court); Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423 (1958) (dismissal for "doubtful trust and reliability" and "lack of candor"); Nelson v. County of Los Angeles, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960) (dismissal based upon a statutory ground of "insubordination"). In the present case, refusal to sign the oath is the basis of the unpermitted inference of guilt (i. e. disloyalty).[6]

For these reasons, while the legislature may utilize an oath to determine the loyalty of persons in public employment, it may not, in a loyalty requirement such as this, make refusal to take the oath a conclusive basis for exclusion from public employment. Those who refuse to take the oath for reasons other than disloyalty must be given an opportunity to explain their refusal. The burden remains with the state to prove the disloyalty of those excluded from public employment, cf. Speiser v. Randall, supra.

We recently indicated that a legislative act providing for the suspension of automobile registrations and driver's licenses under specified conditions, would be unconstitutional unless a hearing would be granted, if sought, in which the factual determination of those specified conditions would be made, Schecter v. Killingsworth, Ariz. 380 P.2d 136 (1963). A right not to be discriminately discharged from public employment is as important and as protected a right as the right to drive on the public highway. Here too, the factual determination of the condition which justifies discharge, disloyalty, must be made at a hearing if requested.

The plaintiff is a continuing teacher (i. e. one with tenure) within the meaning of A.R.S. § 15–251. She therefore is entitled, if she so requests, to a hearing under A.R.S. § 15–254,[7] before she may be discharged

---

6. While we need not here decide whether the legislature could require the discharge of those who refuse to take an oath on the basis of "insubordination," there is in my mind a significant difference between discharging an employee for failure to disclose information relevant to his qualifications for employment, as in the cases cited, and discharging an employee for his refusal to do an act which is repugnant to his conscience and which, under such circumstances, is not relevant to his qualifications for employment.

7. "§ 15–254. Hearing on dismissal
"Within fifteen days after receipt of notice of dismissal or termination, a continuing teacher may serve upon a member of the school board or the superintendent, a written request for either a public or private hearing before the board. The hearing shall be held by the board not less than ten nor more than fifteen days after the request is served, and notice of the time and place of the hearing shall be given the teacher not less than three days prior to the date of the hearing. At the hearing the

from her teaching position,[8] cf. Nostrand v. Little, 58 Wash.2d 111, 361 P.2d 551 (1961). If at such hearing, her explanation of her refusal to take the oath is sufficient to rebut any presumption of disloyalty arising therefrom, and if no additional evidence of disloyalty is adduced by the state, she is, in my opinion, entitled to be reinstated and to receive any compensation withheld under the provisions of A.R.S. § 38–231.[9] By this construction the constitutionality of this legislation may, in this case, be upheld and the judgment affirmed. Otherwise I would be compelled to dissent on the constitutionality of the statute.

JENNINGS, Justice.

I agree with Chief Justice Bernstein that without some provision for a hearing at which the plaintiff can explain her refusal to take the oath, the loyalty oath requirement would be unconstitutional. I am not, however, willing to decide at this point that the tenure hearing provided by A.R.S. § 15–254 is sufficient to preserve the constitutionality of the oath statute. Chief Justice Bernstein's view of the availability and scope of the tenure hearing is a minority

view on this court, and would remain so even if I were to join him in his interpretation of the tenure statutes. Furthermore, the plaintiff has not requested a tenure hearing, and we have heard no argument on the scope and effect of such a hearing.

If the plaintiff is indeed entitled to a hearing under the tenure act, she has not exhausted this administrative remedy. I am therefore of the view that it is inappropriate to finally determine the constitutionality of the oath statute as applied to the plaintiff until she has requested an administrative hearing and the outcome of that request is part of the record upon which our decision can be based.

APPENDIX

A.R.S. § 38–231 and § 38–233

As amended Laws 1961, Ch. 108, § 5 and § 6.

"§ 38–231. Officers and employees required to take loyalty oath; form; penalty

"A. In order to insure the statewide application of this section on a uniform basis, each board, commission,

---

teacher may appear in person and by counsel, if desired, and may present any testimony, evidence or statements, either oral or in writing, in his behalf. Within ten days following the hearing the board shall determine whether there existed good and just cause for the notice of dismissal and shall render its decision accordingly, either affirming or withdrawing the notice of dismissal or termination. Good and

just cause shall not include religious or political beliefs or affiliations unless in violation of the oath of the teacher."

8. I consider withholding of compensation tantamount to discharge, supra, note 2.

9. The record fails to show that the plaintiff has requested a tenure hearing, or that such hearing would not result in full reinstatement and the restoration of compensation withheld.

agency, and independent office of the state, and of any of its political subdivisions, and of any county, city, town, municipal corporation, school district, and public educational institution, shall immediately upon the effective date of this act completely reproduce § 38–231 as set forth herein, to the end that the form of written oath or affirmation required herein shall contain all of the provisions of said section for use by all officers and employees of all boards, commissions, agencies and independent offices.

"B. For the purposes of this section, the term officer or employee means any person elected, appointed, or employed, either on a part-time or full-time basis, by the state, or any of its political subdivisions or any county, city, town, municipal corporation, school district, public educational institution, or any board, commission or agency of any of the foregoing.

"C. Any officer or employee elected, appointed, or employed prior to the effective date of this act shall not later than ninety days after the effective date of this act take and subscribe the form of oath or affirmation set forth in this section.

"D. Any officer or employee within the meaning of this section who fails to take and subscribe the oath or affirma-

tion provided by this section within the time limits prescribed by this section shall not be entitled to any compensation unless and until such officer or employee does so take and subscribe to the form of oath or affirmation set forth in this section.

"E. Any officer or employee as defined in this section having taken the form of oath or affirmation prescribed by this section, and knowingly or wilfully at the time of subscribing the oath or affirmation, or at any time thereafter during his term of office or employment, does commit or aid in the commission of any act to overthrow by force or violence the government of this state or of any of its political subdivisions, or advocates the overthrow by force or violence of the government of this state or of any of its political subdivisions, or during such term of office or employment knowingly and wilfully becomes or remains a member of the communist party of the United States or its successors or any of its subordinate organizations or any other organization having for one of its purposes the overthrow by force or violence of the government of the state of Arizona or any of its political subdivisions, and said officer or employee as defined in this section prior to becoming or remaining a member of such organization or organizations had knowledge of said un-

lawful purpose of said organization or organizations, shall be guilty of a felony and upon conviction thereof shall be subject to all the penalties for perjury; in addition, upon conviction under this section, the officer or employee shall be deemed discharged from said office or employment and shall not be entitled to any additional compensation or any other emoluments or benefits which may have been incident or appurtenant to said office or employment.

"F. Any of the persons referred to in Article XVIII, Section 10 of the Arizona Constitution as amended, related to the employment of aliens, shall be exempted from any compliance with the provisions of this section.

"G. In addition to any other form of oath or affirmation specifically provided by law for an officer or employee, before any officer or employee enters upon the duties of his office or employment, he shall take and subscribe the following oath or affirmation:

"State of Arizona, County of —————I,————— do solemn-
(type or print name)
ly swear (or affirm) that I will support the Constitution of the United States and the Constitution and laws of the State of Arizona; that I will bear true faith and allegiance to the same, and de-

fend them against all enemies, foreign and domestic, and that I will faithfully and impartially discharge the duties of the office of—————(name of office)—————according to the best of my ability, so help me God (or so I do affirm).

———————————————
(signature of officer or employee)"

§ 38–233. Filing oaths of record

"A. The official oaths of state elective officers shall be filed of record in the office of the secretary of state. The official oaths of all other state officers and employees shall be filed of record in the office of the employing state board, commission or agency.

"B. The official oaths of notaries public and of elective county and elective precinct officers shall be filed of record in the office of the county recorder, except the oath of the recorder, which shall be filed with the clerk of the board of supervisors. The official oaths of all other county and precinct officers and employees shall be filed of record in the office of the employing county or precinct board, commission or agency.

"C. The official oaths of all city, town or municipal corporation officers or employees shall be filed of record in the respective office of the employing board, commission or agency of the

cities, towns and municipal corporations.

"D. The official oaths of all officers and employees of all school districts shall be filed of record in the office of the superintendent of public instructions.

"E. The official oaths of all officers and employees of each public educational institution except school districts shall be filed of record in the respective offices of said public educational institutions.

"F. The official oath or affirmation required to be filed of record shall be maintained as a permanent official record."